UNITED STATES of America, Plaintiff,

v.

**Randall D. ADAIR, Defendant.**

UNITED STATES of America, Plaintiff,

v.

**David Lee BLAIR, Defendant.**

**Nos. CR–95–003–S, CR–95–014–S.**

United States District Court,
E.D. Oklahoma.

Oct. 10, 1995.

Linda Epperly, Ass't. U.S. Attorney, Muskogee, OK, for plaintiff.

Stephen J. Greubel, Ass't. Federal Public Defender, Tulsa, OK, for defendant.

## ORDER

SEAY, Chief Judge.

### Granting Defendants' Motions to Dismiss for Lack of Jurisdiction

#### I. FACTUAL BACKGROUND

These two criminal cases, arising out of substantially similar facts, have been consoli-dated for the sole purpose of hearing evidence and ruling on the defendants' motions to dismiss, both of which challenge the jurisdiction of this court.

In the *Adair* case (CR–95–003–S), the defendant was indicted in this district on January 4, 1995, on four counts of aggravated sexual abuse in violation of 18 U.S.C. § 2241(a). Both the defendant Adair and Evelyn K. Adair, the alleged victim, are members of the Cherokee Indian tribe. The location where the alleged offenses took place is a house in which Evelyn Adair and her daughter were residing. The house is not within the limits of an Indian reservation, and the real property is a former Indian allotment which is no longer restricted, title to the property having been conveyed to the Cherokee Nation Housing Authority (CNHA), a state agency. The house is located in an area the government calls "Rocky Mountain" in Adair County, Oklahoma. Federal jurisdiction, pursuant to 18 U.S.C. § 1153, is based upon the allegation in each of those counts that the defendant Adair committed the alleged criminal act in Adair County, Oklahoma, in the Eastern District of Oklahoma, within "Indian Country".[1]

In the *Blair* case (CR–95–014–S), the defendant, a non-Indian, was indicted in a three-count indictment on February 15, 1995, two counts alleging violations of 18 U.S.C. § 2241(c), for aggravated sexual abuse, and one count of attempted escape from lawful custody. The location where the alleged aggravated sexual abuse counts took place is a house in which the alleged Indian victim, her mother, and the defendant were residing. The house is located in the same "Rocky Mountain" area in Adair County, Oklahoma. This property is not on an Indian reservation, and it is not an Indian allotment, but a former allotment, no longer restricted, title to the property having been conveyed to the CNHA, a state agency. The government alleges jurisdiction, pursuant to 18 U.S.C. § 1152, by claiming the alleged crimes were

---

1. "Indian Country" is basically defined in 18 U.S.C. § 1151 as:

 (a) all land within the limits of any Indian reservation;

 (b) all dependent Indian communities; and

 (c) all Indian allotments, the Indian titles to which have *not been* extinguished.

committed in "Indian country", pursuant to § 1151(b).

Thus, in both of these cases, jurisdiction is based upon the alleged offenses having occurred in Indian country or a "dependent Indian community." Both defendants have moved to dismiss, alleging the locations of the offenses in both of these cases are not in a "dependent Indian community." On May 16, 1995, a hearing was held on these motions, the defendants and their attorneys were present, and the government was represented by Linda Epperley, Assistant United States Attorney. In accepting the burden of proving federal jurisdiction, or that Rocky Mountain is a "dependent Indian community," the government presented a number of witnesses. The defendants presented one witness.

## II. EVIDENTIARY HEARING

Steve Woodall, Director of Research & Analysis for the Cherokee Nation of Oklahoma, testified that he collects and disseminates information about the Cherokee Nation. At the request of William Patrick Ragsdale, Director of the Cherokee Nation Marshal's Service, Mr. Woodall's office prepared plaintiff's exhibits Nos. 1 and 3. (Tr. pp. 7–14). Plaintiff's Exhibit No. 1 is a map, based on 1990 census figures, showing Indian population in the fourteen northeastern counties of Oklahoma which were the original lands allotted to the Indians of the Cherokee Nation of Oklahoma by the United States Government. The area designated "A" on plaintiff's exhibit No. 1 is a census tract in Adair County, Oklahoma. The area designated "B" on plaintiff's exhibit No. 1 is "Block Group 3" within that census tract. Woodall testified that, according to 1990 census figures, Block Group 3 contained 434 Indians and 413 non-Indians. (Tr. p. 25). The area designated "C" on plaintiff's exhibit No. 1 is his and Marshal Ragsdale's estimate of what comprises the "Rocky Mountain community." He testified that the Indian and non-Indian population in area "C" is unknown. (Tr. pp. 40–41). Although Woodall's own estimate of what comprises the "Rocky Mountain community" is an area two to three miles north and south by eight to ten miles

east and west, or sixteen to thirty square miles, he does not know of any boundaries, as such, for the "Rocky Mountain community," and he did not know anyone who did. (Tr. p. 41). That area designated "C" on plaintiff's exhibit No. 1 is shown to scale in plaintiff's exhibit No. 3, and comprises a fifteen square mile area which the government proposes is the "Rocky Mountain community."

Plaintiff's exhibit No. 3 also purports to identify all Cherokee restricted allotment lands in orange. However, Annette Jenkins, Director of Real Estate Services for the Cherokee Nation, testified that the information on which the Cherokee restricted allotment lands was based came from Bureau of Indian Affairs (BIA) files which had not been updated and could be two or three or more years old. (Tr. pp. 48–50). Thus, although this is the maximum amount of restricted allotment lands which might be located in this fifteen square mile area, the present amount of restricted allotment lands could be smaller. Ms. Jenkins testified that the blue areas on plaintiff's exhibit No. 3 are the subject properties which are the locations of the alleged criminal offenses in these two cases. Subject property # 1 is the property which is the subject of the *Adair* indictment. Subject property # 2 is the property which is the subject of the *Blair* indictment. She testified that the current property records show the title to these properties, at the times of the alleged offenses, were held by the CNHA, an agency of the State of Oklahoma, operated by the Cherokee Nation of Oklahoma, to provide housing to needy Cherokee Indians within a fourteen county area of northeastern Oklahoma. (Tr. pp. 70–71).

Brad Rutherford, Assessor for Adair County, Oklahoma, testified and verified this title information on the two subject properties. He testified that he was not asked to check the Adair County records on any other properties, other than the two subject properties.

Joel Thompson, Executive Director of the CNHA, testified that the CNHA provides housing for members of the Cherokee Nation of Oklahoma in need of housing. (Plaintiff's exhibits 5 and 8). He testified that the two properties which are the subjects of these

two indictments are owned in fee simple by the CNHA, and that they were so owned at the time of the alleged offenses. (Plaintiff's exhibits Nos. 13–32 and 37–54). The CNHA is a state agency created pursuant to state law under the Oklahoma Housing Authorities Act, 63 O.S. §§ 1051, et. seq. Mr. Thompson testified that CNHA units are provided to tribal members on an application-need basis within the fourteen county area recognized as the Cherokee Nation of Oklahoma. He testified that, although the units on the two subject properties are within the fifteen square mile area designated in plaintiff's exhibit No. 3 as the Rocky Mountain community, those units were not provided because they were located in that area or for that area, but because of individual need. He was unable to testify as to how many CNHA units were located in the area designated in plaintiff's exhibit No. 3 as the Rocky Mountain community or in any one county. (Tr. p. 130). Mr. Thompson testified that CNHA uses county or city water, sewer, and electric facilities or services. For units in the Rocky Mountain area, water is provided by individual wells or Adair County Rural Water District # 2, and electricity is provided by Ozark Electric. Both are public utilities. (Tr. pp. 132–134). Further, Mr. Thompson testified that some participants in the CNHA program may not be Indian and may not be members of the Cherokee Nation of Oklahoma. Also, in cases of death or divorce a non-Indian may end up with the CNHA unit, and in such cases the CNHA follows the Oklahoma state law. (Tr. p. 107, 135–136). Further, if the CNHA repossesses a unit, it does not necessarily go to another family member, but the next needy tribal applicant for housing on their list. Mr. Thompson agreed that, because the CNHA owns the property in fee and the occupant pays them for using the property until it is paid off, CNHA occupants are more like tenants than homeowners. (Tr. pp. 137–140).

Duane King qualified and testified as an expert on Cherokee Indian history and culture. He testified that, by the end of the 19th century, churches had generally replaced townhouses as the central meeting places for Cherokee communities. He testified that he had been in the Rocky Mountain area as depicted in plaintiff's exhibit No. 3. He testified that within that area there was what he described as an Indian church, Echota Church, an Indian cemetery, Echota Cemetery, and an Indian stomp ground. However, he only observed what he perceived to be the Indian culture of the area, and he did not talk to any non-Indians. Although there are non-Indian churches and cemeteries in the area, he did not find them or seek them out. He did not know the makeup of the membership of the Echota Church. He testified that a Cherokee community cannot be defined by geographical boundaries, but is determined by the social feelings of the people who live, and have lived, in a particular area. Mr. King believed the Cherokee Indian population to be approximately one-half the population of the entire area, and that there were a number of those who spoke the Cherokee language. It was his opinion that, in comparison to other communities in the area, the Rocky Mountain area was a more traditional Cherokee community. (Tr. p. 161).

Julie Moss testified that she had been a resident of the Rocky Mountain area since 1983. She testified that she lived near the Indian stomp ground where regular religious and dance ceremonies were held. She believed that the stomp ground had been there about thirty-five years. She stated that the gathering places in the community are the Echota Church, the stomp ground, the two or three small convenience stores in the area, and the Rocky Mountain school, grades one through eight. (Tr. p. 178). She testified that most people who live in the area work outside the area in Stilwell, Oklahoma, the county seat of Adair County, about two to five miles southeast, or at a landscape nursery about five miles west in the adjoining Cherokee County. She testified that most people in the community travel to Stilwell or to Tahlequah, in Cherokee County, Oklahoma, about twenty miles northwest, for their health care and to do their major grocery shopping. (Tr. pp. 182–186).

Imogene Alexander, Coordinator of the Education Department of the Cherokee Nation, testified that her department provides funds from the Bureau of Indian Affairs

(BIA) to individual Cherokee Indian applicants to supplement State of Oklahoma school funds. These supplemental tribal funds are provided to individual Cherokee Indian students in the Oklahoma school system throughout the fourteen counties which originally comprised the Cherokee Nation. She testified that only approximately sixty percent (60%) of the students at the Rocky Mountain community school are Indian, and some of those students receive these supplemental funds from the Cherokee Nation. The Rocky Mountain school is a dependent state school district in which the students attend grades one through eight. Thereafter, the students attend high school in Stilwell. She also testified that, if needed, there is a Cherokee language speaker at the Rocky Mountain school to provide bilingual assistance to the Cherokee Indian students, although neither she nor anyone else testified that any student ever required or requested such assistance. (Tr. pp. 191–195).

Joe Kennison, Director of Roads and Transportation of the Cherokee Nation, testified that his department is budgeted approximately $8 million for building or improving roads within the fourteen county Cherokee Nation of Oklahoma area. The Cherokee Nation develops a priority list of locations that identifies road improvements which would most benefit members of the Cherokee Nation. The State of Oklahoma deeds these roads to the Cherokee Nation; the Cherokee Nation improves the road; the Cherokee Nation deeds the road back to the State of Oklahoma; and the counties maintain the roads just like other state highways. Although there is one highway in the Rocky Mountain area which was improved by the BIA, the Cherokee Nation has not built or improved any roads in the Rocky Mountain area or anywhere else in Adair County. (Plaintiff's exhibit No. 2). Mr. Kennison testified that he considered the area around the Rocky Mountain school as the Rocky Mountain community area. (Tr. pp. 203–210).

William Ragsdale testified he is the Director of the Cherokee Nation's Marshal's Service. Marshal Ragsdale said he entered into cross-deputization agreements with the state law enforcement officers in the fourteen counties of the original Cherokee Nation. Also, Marshal Ragsdale claims he has exclusive law enforcement jurisdiction on any "Indian country" lands within those fourteen counties. Marshal Ragsdale was the investigating officer for the offenses in these two criminal cases. (Tr. p. 215). However, because the Cherokee Nation Marshal's Service does not have any dispatching facilities, persons in Adair County and the Rocky Mountain area call the Adair County Sheriff's Office for law enforcement assistance, and the Adair County Sheriff's Office responds to those calls in that area. (Tr. pp. 252–253). He testified that prior to his becoming Director of the Cherokee Nation's Marshal's Service three years ago, these types of criminal cases in this area were filed and prosecuted in the Oklahoma state district courts. (Tr. p. 245). Since becoming Marshal of the Cherokee Nation he has made a determination that at least four areas in Adair County and a number of areas in Cherokee and Delaware Counties are "dependent Indian communities" and subject to exclusive Cherokee Nation law enforcement jurisdiction as "Indian country", although no federal court has made any such determination of any area in the Eastern District of Oklahoma. (Tr. pp. 264–267). Marshal Ragsdale testified that he made a determination of the Rocky Mountain community as shown in plaintiff's exhibit No. 3 by talking to people in the area, and although he knows the general area of the Rocky Mountain community, he does not know the boundaries of that area. He said there is no list or designation, such as in a telephone directory, of the residents of the community or area. (Tr. pp. 256–257). Marshal Ragsdale testified about a number of Cherokee Nation community development programs which are available to Cherokee Indians in the Rocky Mountain community. (Tr. pp. 218–227, 236–239). However, these programs are available to them because they are Cherokee Indians living within the original Cherokee Nation fourteen county area, and not because they are members of the Rocky Mountain area. (Tr. pp. 246–248, 254–256). He further testified that a person does not have to have *any* Indian blood to be a tribal member in the Cherokee Nation of Oklahoma. (Tr. p. 268). The court found

many of Marshal Ragsdale's answers to be unresponsive or evasive. (Tr. p. 248).

Larry Boles, an investigator for the Federal Public Defender's Office, was the only witness for the defendants. He testified he was familiar with the Rocky Mountain area of Adair County, and that he had grown up in the small Adair County community of Baron, located between Stilwell and Westville, approximately ten to twelve miles northeast of the Rocky Mountain area. (Tr. p. 270). Unlike Rocky Mountain, Baron is designated on the state highway map. At the request of the defendants' attorneys, he had made three trips into and around the Rocky Mountain area on virtually every road in the area designated by the government as Rocky Mountain. (Tr. p. 275). He described the area as a rural area with most of its residents scattered out. He testified that there is dairy farming and cattle raising within the area. (Tr. p. 276). He stated that as one approachs the Rocky Mountain area there is nothing to denote this as a separate area or set it apart from the surrounding area. He saw few persons or vehicular traffic. There are no road signs designating the area, except for one sign for the Rocky Mountain school. (Tr. p. 277). He gave the same description of Rocky Mountain school system as the other witnesses. (Defendant's exhibit No. 2). He testified there is one small gas station/convenience store in the designated area and two others in areas adjoining the designated Rocky Mountain area. Most residents told him they do their major grocery shopping and banking in Stilwell or Tahlequah. He said the nearest employers and health care providers are in Stilwell, and all of the mailing addresses for the Rocky Mountain area are either rural route #1 or rural route #4, Stilwell, Oklahoma. He said the nearest fire department is a rural fire department approximately five miles south of plaintiff's designated area of Rocky Mountain, and all of the utilities in the area are provided by companies outside of the Rocky Mountain area. Mr. Boles testified that within the area there is no local government and no local community organizations. There are three churches in the area, one Indian and two non-Indian. A monthly Indian stomp dance is the only regular activity in the area. On his three trips, Mr. Boles talked, at random, with twenty to twenty-five of the residents, some Indian, some non-Indian, of the immediate and surrounding areas. He found that some of the persons who lived inside the area designated as the Rocky Mountain "community" on plaintiff's exhibit No. 3 believed that they lived in a different named community bordering that area, such as Lyon Switch, Cave Springs, Wauhillau, or Bidding Spring, and some who lived outside that area believed themselves to reside in the Rocky Mountain "community." Mr. Boles testified that he tried to determine the boundaries of the Rocky Mountain "community," but he could not, and neither could the residents of the area. (Tr. pp. 277–293).

## III. HISTORICAL LEGAL BACKGROUND

The term "dependent Indian community" derives from, and was included in 18 U.S.C. § 1151 as a result of, the United States Supreme Court decisions in the cases of *United States v. Sandoval*, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913) and *United States v. McGowan*, 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938). *Blatchford v. Sullivan*, 904 F.2d 542, 544–545 (10th Cir.1990), *cert. denied*, 498 U.S. 1035, 111 S.Ct. 699, 112 L.Ed.2d 689 (1991). Although the areas being considered in the *Sandoval* and *McGowan* cases were not technically Indian "reservations", the court found the dependency of the Indians on the government in those communities was sufficiently similar to the dependency of reservation Indians to include those areas within the meaning of the term Indian country. Thus, the term "dependent Indian community" was included in § 1151. This was particularly true in light of the title to the area lands in the *Sandoval* case being held communally by the pueblo or tribe, rather than individually, and the area lands in the *McGowan* case being purchased by the government specifically for the purpose of providing land for needy Indians and to equip and supervise those Indians in establishing a permanent settlement, and the title to those lands being in the government in trust for those Indians. The *Blatchford* court noted that the holding of the pueblos communally

rather than in individual ownership was significant to the outcome in the *Sandoval* case. *Blatchford*, 904 F.2d at 545. In contrast, it is well documented that the whole thrust of allotment of Indian land among the Five Civilized Tribes (Cherokee, Choctaw, Creek, Seminole, and Chickasaw), after their removal from their homeland in the southeastern United States to Oklahoma, involved individual ownership.

> This process culminated in the allotting of sixteen million acres of tribal lands to the individual members of the Tribes, to intermarried whites, and to African–American freedmen ... Today, approximately 20,000 tracts of allotted Indian land held by members of the Five Tribes in eastern Oklahoma-covering over 400,000 acres-remain subject to federal statutory restrictions on their alienation.

*"Fatally Flawed": State Court Approval of Conveyances by Indians of the Five Civilized Tribes–Time for Legislative Reform*, 25 Tulsa L.J. 1, 3 (1989).

The court finds it noteworthy that the same philosophy, i.e., being sufficiently similar to the dependency of reservation Indians, was prevalent in the case of *United States v. Pelican*, 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1913), which is the case that caused part (c), all Indian allotments, the Indian titles to which have not been extinguished, to be included in the definition of Indian country in § 1151. Although that case was an allotment case, the nature of the title to the lands and their similarity to reservation lands is significant in considering the nature of the title to the lands in this case and other Indian country cases. In the *Pelican* case, lands which had been a legally constituted Indian reservation were being vacated and restored to the public domain, with the exception of certain lands which were expressly reserved and allotted to individual members of the Indians of the Colville Reservation, i.e., Indian allotments. Title to these Indian allotments, carved out of the original Colville Indian Reservation, was held by the government in trust for the Indians.[2] In holding that these Indian allotments were "Indian country", the *Pelican* court found that the allotments, like the original Colville Reservation, were validly set apart for the use of the Indians under the superintendence of the government, the fundamental consideration being the protection of a dependent [Indian] people. *Pelican*, 232 U.S. at 449–450, 34 S.Ct. at 399. This court notes that, unlike the Indian trust allotments described in *Pelican*, Oklahoma Indian allotees received fee simple title subject to restriction. Cherokee Treaty of Dec. 29, 1835, 7 Stat. 478 (1836).

The federal allotment policy with regard to the Five Tribes differed sharply from practices with other tribes allotted under the provisions of the General Allotment Act. That Act authorized the President to allot tribal lands in designated quantities to reservation Indians, title to be held in trust by the United States for twenty-five years or longer. General Allotment Act allottees and their heirs, regardless of blood quantum, hold "trust patents" to their lands, with the legal fee vested in the United States, and the equitable fee vested in the Indians for the period of trust.

In contrast, the Five Tribes had received fee simple title to their tribal lands in Indian Territory, and, therefore, the allotment patents were made by the principal chief of each Tribe to their allottees, conveying all the right, title, and interest of the respective Tribe in the land. Members of the Five Tribes hold "restricted patents" as opposed to "trust patents." The distinction is largely an academic one, however, as the federal government's interest, as guardian of the Indian lands and resources, is virtually identical in both classes of allottees ... 25 Tulsa L.J. 1, 8 (1989).

Although the author of the law review article concludes that the distinction between the restricted patents held by the Five Civi-

---

2. In fact, a close reading of the *Pelican* case, reveals an intent by the court that these Indian allotment lands were to be considered "Indian country", or within the exclusive jurisdiction of the federal government, only so long as the title to said lands was held by the government in trust for the Indians. *Pelican*, 232 U.S. at 447–451, 34 S.Ct. at 398–400. Thus, the statute, 18 U.S.C. § 1151(c), which only qualifies Indian allotments as to "the Indian titles to which have not been extinguished", is actually more inclusive than the case upon which it was based.

lized Tribes and the trust patents held by the Plains Indians is not significant, this court observes with interest that trust patents had their genesis in reservation land of the Plains Indians held in trust for various Plains tribes, while the restricted patents of the Five Civilized Tribes originated from lands owned in fee simple by the Five Civilized Tribes. Thus, there is a strong question as to whether it is historically correct to suggest that tribal land acquired by the Five Civilized Tribes at the time of their removal to Oklahoma was ever a part of a reservation as we have come to know reservations located in the western United States, such as those associated with the Pueblos and other Plains Indians.

■ The Cherokees and other five civilized tribes in their treaties with the United States received fee title to land in Oklahoma in exchange for the land they gave up in the southeastern United States. *Kapplers Laws and Treaties,* Vol. 2, p. 440; 7 Stat. 478; *Cherokee Nation v. Journeycake,* 155 U.S. 196, 197, 15 S.Ct. 55, 56, 39 L.Ed. 120. Unlike the less-cultured nomadic Plains Indians of the western United States, the Five Civilized Tribes Indians were not assigned to specific reservation areas but were assigned land in fee with the intention of allowing development of their agrarian culture.

The Cherokee and Choctaw Indians in particular attempted, following "removal", to transplant their agrarian culture to Oklahoma by continuing southern plantation-type farming. Angie Debo, a well-respected Five Civilized Tribes historian, in her book, *And Still the Waters Run* gives a graphic description of a successful Choctaw farming operation.

> The richest Choctaw, Wilson N. Jones, was said to hold 17,600 acres under fence, of which 550 acres was under cultivation, and to own 5,000 cattle, 75 horses, several coal mines, a store, and a cotton gin. It was not illegal for a citizen to lease his personal holdings to non-citizens, and most of the labor on these great farms was performed by white or Negro tenants.

Angie Debo, *And Still the Waters Run* 17 (1940). This cross-culturalization is also not-

ed by the court in *Morris v. Watt,* 640 F.2d 404 (D.C.Cir.1980):

> The Creek, Cherokee, Seminole, Choctaw and Chickasaw tribes comprise the group known as the Five Civilized Tribes. These tribes were culturally and politically sophisticated relative to the Plains Indians, who inhabited the Oklahoma area to which the tribes were forcibly removed from their native southeast by the federal Government under the Indian Removal Act of 1830. *Harjo,* [*v. Kleppe*], 430 [420] F.Supp. [1110] at 1199 [ (D.C.D.C.1976) ]. See also, *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 622–26, 90 S.Ct. 1328, 1330–32, 25 L.Ed.2d 615 (1970).

Historian Debo vividly illustrates that the assimilation of Cherokees and Choctaws into the white man's culture began even before removal.

> One important result of this closer intercourse was the rapidity with which the Indians, especially the Cherokees and Choctaws, began to adopt the white man's institutions. They invited Christian missionaries to their country and established churches and schools, they adopted constitutions and legal codes, and some of their leaders began to operate plantations worked by Negro slaves. The progress of the Cherokees was especially rapid at this time, because Sequoyah, one of the greatest geniuses ever produced by any race, invented a phonetic alphabet that enabled the whole tribe to become within a few months a literate people.

Angie Debo, *And Still the Waters Run* 1–2 (1940).

Additional historical facts suggest the pronounced distinction between land acquired by the Five Civilized Tribes and "reservations" located in the western United States. From the beginning of the Five Civilized Tribes' occupation of Oklahoma, the cultural constituency was predominantly non-Indian as reflected by:

> The first United States census of the Indian Territory, which was made in 1890, shows the approximate racial composition. It classed the inhabitants according to physical appearance without regard to citizenship, but it reveals in a startling way

how the Indians were crowded in their last refuge by the pressure of other races. The statistics are as follows:

| NATION | WHITES | NEGROES | INDIANS | TOTAL | PERCENTAGE OF INDIANS |
|---|---|---|---|---|---|
| Cherokee | 29,166 | 5,127 | 22,015 | 56,309 | 39.1 |
| Choctaw | 28,345 | 4,406 | 11,057 | 43,808 | 25.24 |
| Chickasaw | 48,421 | 3,676 | 5,223 | 57,329 | 9.11 |
| Creek | 3,287 | 4,621 | 9,999 | 17,912 | 55.82 |
| Seminole | 172 | 806 | 1,761 | 2,739 | 64.29 |
| Total | 109,393 | 18,636 | 50,055 | 178,097 | 28.11 |

Angie Debo, *And Still the Waters Run* 13 (1940).

As mentioned herein, as of the year 1989, over 15½ million of the original 16 million acres allotted to the Five Civilized Tribes has through the restriction removal process been assimilated into the Oklahoma culture as taxable state land. Conversion of 98% of all land originally owned by the Five Civilized Tribes to the taxable inventory of the State of Oklahoma is conclusive proof that there are only small parcels of restricted Indian allotment land ownership scattered over more than 30 eastern Oklahoma counties. This restricted Indian allotment ownership, which is graphically demonstrated by the testimony describing the Rocky Mountain Community, does not support the conclusion that the Rocky Mountain area is a dependent community. To the contrary, the testimony in this case simply reflects that the Rocky Mountain area is a typical slice of rural eastern Oklahoma occupied by a mixed culture of people attempting to hold on to their agrarian roots. This court's observations are somewhat similar to Historian Debo.

The cultural amalgamation of the two races was the most successful. Probably more than any other state in the Union Oklahoma has accepted the cultural heritage of the Indian, and has used it as a background of its own traditions; on the other hand even the most conservative Indians have adopted the clothing and habits and religion and to a certain extent even the language of their white neighbors.

The spiritual union of the two races was accepted from the beginning. The name of the state itself is a Choctaw expression meaning "Red People," and was first suggested by an able and cultured Choctaw Chief during the treaty negotiations of 1866. The Great Seal of the State, designed by young Gabe E. Parker, in the Constitutional Convention, and Dr. A. Grant Evans, is a five-pointed star with the seal of Oklahoma Territory in the center and the seal of one of the Civilized Tribes in each of the rays. The Oklahoma Territory seal itself showed a frontiersman and an Indian clasping hands, with an industrial and a hunting scene as their respective backgrounds, and a figure of justice with her scales poised between. If this ideal was not entirely realized, the fact was due to the individual greed of the white man and the individual ineptitude of the red rather than to any general racial discrimination. The constitution, which expressly legalized the segregation of the colored race, defined the term "colored" to apply only to persons of African descent and "white race" to include all other persons. The union of the two races was portrayed in the allegorical wedding of the statehood ceremonies, and Governor Haskell in his inaugural address glorified Oklahoma as a state where the original owners of the soil had not been conquered, but had joined with their white neighbors in forming a new commonwealth, and he found in the red and white stripes of the American flag a new symbolism of the red man and the white united under the azure sky.

Angie Debo, *And Still the Waters Run* 291–292 (1940).

The *McGowan* court, in describing the land purchased by the government for the Indians, used the identical language of the

*Pelican* case: "The fundamental consideration of both Congress and the Department of the Interior in establishing this colony has been the protection of a dependent people. Indians in this colony have been afforded the same protection by the government as that given Indians in other settlements known as 'reservations'." *McGowan*, 302 U.S. at 538, 58 S.Ct. at 287. Notice the *McGowan* court equated the protection of dependent people [Indians] in its case to the protection of reservation Indians.

■ It is pertinent, and the court finds, the dates of the *Sandoval, McGowan* and *Pelican* decisions, 1913, 1938 and 1913 respectively, to be significant, because at those times Indian tribes, communities, and peoples were, and had been historically, almost totally dependent upon the federal government. In fact, the dependency of Indians and Indian tribes seems to have been a given factor in an era that even questioned the Indians' citizenship in the United States. In referring to Indians and Indian tribes, those decisions made, what would be considered today, derogatory and demeaning remarks and characterizations.[3] Certainly today's society, including the government, judiciary and the public, no longer maintain such attitudes or beliefs toward Indians or Indian tribes. All Indians and Indian tribes are no longer nineteenth century dependent wards of the government, requiring protection from an alien citizenry or other Indian tribes, as exemplified by "Indian Self–Determination Act", 25 U.S.C. § 450, et seq. Further, Congress at 25 U.S.C. § 450(a)(b) in 1994 amendments to the Indian Self Determination Act stated:

The Congress declares its commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indi-

an tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services.

Finally, incorporating the concept of assimilation into its most recent opinion on racial discrimination, the Supreme Court stated, "In the eyes of government, we are just one race here. It is American." *Adarand Constructors, Inc. v. Pena, Secretary of Transportation, et al.,* —— U.S. ——, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).

## IV. THE "DEPENDENT INDIAN COMMUNITY" STANDARDS

■ Until recently, the *Blatchford* case set the guideline standards in this circuit for a district court's determination of what constitutes a "dependent Indian community" as set out in 18 U.S.C. § 1151(b). Noting in *United States v. Martine*, 442 F.2d 1022, 1024 (10th Cir.1971), that the test for such a determination is not simple, the *Blatchford* court implicitly adopted the Eighth Circuit's test and held that the trial court, in determining whether or not a particular area or community is a "dependent Indian community", should consider (1) the nature of the area in question, (2) the relationship of the inhabitants of the area to Indian Tribes and to the federal government, and (3) the established practice of government agencies toward the area. The court noted that any other relevant factors should also be considered. *Blatchford*, 904 F.2d at 545. In discussing several Eighth Circuit cases concerning "dependent Indian community" status, the

---

**3.** "The people of the pueblos, ... are nevertheless Indians in race, customs and domestic government. Always living in separate and isolated communities, adhering to primitive modes of life, largely influenced by superstition and fetichism, and chiefly governed according to the crude customs inherited from their ancestors, they are essentially a simple, uninformed and inferior people. [I]t remains an open question whether they have become citizens of the United States." *Sandoval*, 231 U.S. at 39, 34 S.Ct. at 3.

"These Indians are yet wards of the Nation, in a condition of pupilage or dependency, and have not been discharged from that condition. They occupy these lands [by an agreement that] is part of the national policy by which the Indians are to be maintained as well as prepared for assuming the habits of civilized life, and ultimately the privileges of citizenship." *Pelican*, 232 U.S. at 450, 34 S.Ct. at 399.

*Blatchford* court noted that a crucial consideration was whether the community had been set apart for the use, occupancy and [federal governmental] protection of dependent Indian peoples. *Blatchford,* 904 F.2d at 546 and 548-549. The Rocky Mountain area of Adair County, Oklahoma, has not been set aside or apart for the use, occupancy and federal protection of the Indians who live in that area. The mere presence of a group of Indians who constitute the bulk of the population living in that area or community, and who give that area or community a distinctly Indian character, does not make that area or community a "dependent Indian community" as contemplated by § 1151. Here, at most, only fifty percent of the population is Indian. *Blatchford,* 904 F.2d at 549, citing *Martine,* 442 F.2d at 1024. The *Blatchford* court also noted that in all three of the Eighth Circuit cases in which a "dependent Indian community" status was found to exist, the lands in question were tribal trust lands or lands titled in the United States Government in trust for an Indian tribe. *Blatchford,* 904 F.2d at 548.

■ Now, the Eighth Circuit has added to and refined the *Blatchford* test, and the Tenth Circuit has, in *Pittsburg & Midway Coal Mining Company v. Watchman,* 52 F.3rd 1531, 1545 (10th Cir.1995), explicitly adopted the Eighth Circuit's four-prong test for determining what constitutes a "dependent Indian community" under 18 U.S.C. § 1151(b). Whether a particular geographical area is a "dependent Indian community" depends on a consideration of several factors, including: (1) whether the United States has retained title to the lands which it permits the Indians to occupy and authority to enact regulations and protective laws respecting that territory; (2) the nature of the area in question, the relationship of the inhabitants in the area to Indian tribes and to the federal government, and the established practice of government agencies toward the area;[4] (3) whether there is an element of cohesiveness manifested either by economic pursuits in the area, common interests, or needs of the in-

habitants as supplied by that locality; and (4) whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples. *id.* The court noted that before considering these factors, it was necessary to determine the community of reference by examining the status of the area in question as a community and the surrounding area. *Pittsburg & Midway Coal Mining v. Watchman,* 52 F.3d at 1543-1545.

## A. The Status of Rocky Mountain as a Community and the Surrounding Area

■ As hereinbefore described, the "Rocky Mountain area" in west, central Adair County, Oklahoma, is not on any maps, and it does not have any definite or definable geographical boundaries. Although the government's estimates of the size of this community or area vary from fifteen to thirty square miles, the factual evidence of the general nature and character of the "Rocky Mountain area" in Adair County, Oklahoma, is essentially undisputed. It is a typical, without regard to racial population, rural community in a rural county, whose county seat of Stilwell, approximately two to five miles southeast of the area, has a population of approximately 2,700. There are other similar "local communities or areas" in the vicinity, some of which overlap the Rocky Mountain area. There are many such areas in practically every county in the state, particularly rural counties. Based upon the 1990 census information of "Block Group 3", the general population of the Rocky Mountain area and the immediate surrounding area is probably less than 400 persons, and approximately one-half Indian[5], predominately Cherokee, and is one of the more dense Indian populations in eastern Oklahoma. The area surrounding Stilwell, has only one-half the density of Indian population as the Rocky Mountain area, or approximately one-fourth Indian. (Plaintiff's exhibit No. 1). There is a dependent state school district, Rocky Mountain school, grades one through eight, from which the

---

4. These three factors in the second prong of the *Watchman* test are the guideline factors from the *Blatchford* case.

5. Marshal Ragsdale's testimony reflects one can be a member of the Cherokee Tribe with little, or perhaps no, Indian blood (Tr. p. 268).

area gets its name, and two or three churches in the immediate area. There are no businesses, banks, post offices, utilities, or local governmental units within the fifteen to thirty square mile area. Utilities are provided by rural county services, generally out of Stilwell. Except for the area of, and immediately surrounding, the county seat town of Stilwell, which gives Rocky Mountain its economic base, the area surrounding the Rocky Mountain community for twenty miles is the same sparsely populated rural area without any cities or towns, and is undifferentiated from the Rocky Mountain area.

The court finds from all the evidence that Rocky Mountain, the community of reference, is not a community in the traditional Indian or non-Indian meaning of the word, but is a rural area approximately six to twelve square miles in size surrounding the rural state school known as Rocky Mountain. The court finds there are no definite, definable boundaries for the area referred to as the Rocky Mountain community. Even if the Rocky Mountain area was a definitive community, the court could not find that it is an "Indian" community as contemplated by § 1151(b), as the population of the area is only approximately one-half Indian. Nevertheless, the court will apply the *Watchman* factors to the Rocky Mountain area.

### B. Applying the Watchman Factors to The Rocky Mountain Area

■ As recognized by the *Watchman* case, the first factor, i.e., the nature of the title to the land in the area or community in question, is a critical starting point in the determination of whether or not an area or community is sufficiently similar to Indian reservation land and in considering the fourth factor, i.e., whether that community has been set apart or provided land for the use, occupancy and federal protection of dependent Indian peoples, in order to qualify as a "dependent Indian community" as contemplated by § 1151(b). Although the government's retention of title to the lands which it permits the Indians to occupy, or government title in trust for an Indian tribe, does not in and of itself establish an area as a "dependent Indian community" for § 1151

purposes, *Blatchford,* 904 F.2d at 548–549, without such title, consideration of the other *Watchman* factors should be unnecessary. However, in this case, the court has considered all of the *Watchman* factors.

### (1) United States Title to Lands and Retention of Authority to Enact Law

The court finds that title to the land in the general Rocky Mountain area is held by individuals, approximately one-half of whom are Indian, and not by an Indian tribe or by the government in trust for the Indians. The government has not retained title to the lands in this area and just permitted the Indians to occupy it. The government has not retained any authority to enact regulations or protective laws with respect to the area. There are no Indian reservation lands in the area or in Oklahoma, and although a maximum of 14%–15% of the Rocky Mountain area may be restricted Indian allotment lands, that fact alone does not make the area a dependent Indian community, and it would not, even if 100% of the land in the area was restricted Indian allotment land. If the land or area in question was an Indian reservation or all restricted Indian allotment lands, a dependent Indian community determination would be moot and not necessary. Although an Indian reservation might also be considered a dependent Indian community, restricted Indian allotment lands do not so easily equate with a dependent Indian community. In fact allotment lands, even though restricted, were created for the purpose of eventually ending the Indians' dependency upon the United States Government.

### (2) Nature of Area and Relationship of Inhabitants to Tribes and Government and Government Practice Toward Area

In considering the nature of the area, the court adopts its above comments and findings concerning the status of the community. Although approximately one-half of the residents living in this area are some degree Cherokee Indian, they do not live in any kind of communal or traditional tribal life style. The headquarters of the Cherokee Nation of Oklahoma is located in the adjoining County

of Cherokee, in Tahlequah, Oklahoma. The Indians live in individual homes scattered out among non-Indian residences in a rural area. There is no tribal government or local government of any kind in the Rocky Mountain community. The Indian people in the area do not have communal gardens or work projects. The only activity in the area peculiar to Indians is a monthly stomp dance, which is attended by Indians from inside and outside of the area. The State of Oklahoma and the County of Adair builds and maintains the roads in the area. The State of Oklahoma provides and maintains the only public school in the area. The Cherokee Nation does provide a bilingual Cherokee speaker for Cherokee Indian students in that school, if that service is ever needed, and there was no testimony that it is needed. The Adair County Sheriff's Office responds to area residents' calls for law enforcement assistance. The Cherokee Nation does provide some housing for Cherokee Indians in the area through the CNHA, an agency of the State of Oklahoma. However, such housing is not exclusively Indian, and it is not exclusively for the Rocky Mountain area. Utilities are provided by public utility companies outside the area, with the exception of water, which is provided by a rural county water district, a state service. The court finds that neither the life styles, the government, nor the welfare or needs of the Indians living in the Rocky Mountain community or area are in any way similar to those of reservation or dependent Indians.

### (3) Element of Cohesiveness of Inhabitants Supplied by the Community

The court finds that there is little cohesiveness between the inhabitants of the Rocky Mountain area due to economic pursuits, common interests, or needs of its residents. Probably the most significant cohesive factor in the area is the Rocky Mountain school, supplied by the State of Oklahoma for the area. The only element of cohesiveness for the Indian inhabitants of the area would be a common interest in the stomp ground and Indian church, and there is no evidence as to what percentage of area Indians partake of these facilities. The court finds that there is no element of cohesiveness manifested by any economic pursuits in the area, as almost all employment, business, and economic opportunities are outside of the Rocky Mountain area.

### (4) Use, Occupancy and Protection of Dependent Indian People

The court finds that the Rocky Mountain area has not been set apart for the use, occupancy and protection of dependent Indian peoples, with the possible exception of the 14%–15% of restricted allotment lands scattered throughout the area. However, since restricted allotments were created to eventually end dependency, the court finds that this percentage of restricted allotment lands scattered throughout the area does not make the area a dependent Indian community. As to this factor, the court also adopts its above comments and findings concerning the factor on title to the lands in the area.

 It appears to this court that the fourth *Watchman* factor should emphasize a critically important factor in this determination, that being, if there is found to be an Indian community, is that Indian community in fact dependent upon the federal government. In this context, "Dependent" means the Indian community needs for its existence the support and protection of the federal government, such that the federal government created or provided that community for the Indians for their support and protection. There is no evidence that the government or anyone else considers the Indians who live in this area to be dependent, or at least any more or less dependent than non-Indians living in the area, nor are they. Although the Cherokee Indians living within the Rocky Mountain area receive benefits from the Cherokee Nation of Oklahoma, it is because they are Cherokees living within the original allotment boundaries of the Cherokee Nation of Oklahoma and not because they are living in the Rocky Mountain community or area.

In conclusion, the court finds that the area known as Rocky Mountain in Adair County, Oklahoma, is not a "community" as intended by 18 U.S.C. § 1151(b). The court also finds that same Rocky Mountain area is not an "Indian" community. The court further

finds that this Rocky Mountain area is not a "dependent" Indian community as contemplated by § 1151(b). Accordingly, the court finds that the locations of the offenses alleged in these two indictments are not within "Indian country" pursuant to 18 U.S.C. §§ 1151, 1152, and 1153, and this court is without jurisdiction in these two cases. Thus, the defendants' motions to dismiss for lack of jurisdiction are granted, and these two cases are dismissed.

**IT IS SO ORDERED.**