**Herbert Charles BLATCHFORD, Jr.,
Petitioner–Appellant,**

v.

**George SULLIVAN, Warden, and Attorney General, State of New Mexico,
Respondents–Appellees.**

No. 87–1547.

United States Court of Appeals,
Tenth Circuit.

May 30, 1990.

---

Norman S. Thayer, Sutin, Thayer & Browne, Albuquerque, N.M. (Hal Stratton, Atty. Gen. of the State of N.M., George Snyder, Asst. Atty. Gen., Santa Fe, N.M., Stephen Charnas, Sasha Siemel, and James Lawrence Sanchez, Sutin, Thayer & Browne, Albuquerque, N.M., with him on the brief), for respondents-appellees.

Roger J. Marzulla, Acting Asst. Atty. Gen., William L. Lutz, U.S. Atty., Albuquerque, N.M., Jacques B. Gelin and Maria A. Iizuka, Attys., Dept. of Justice, Washington, D.C., on the brief, for the U.S. as amicus curiae.

Paul E. Frye, Nordhaus, Haltom, Taylor, Taradash & Frye, Albuquerque, N.M., on the brief, for the Navajo Tribe of Indians as amicus curiae.

Before MOORE, ANDERSON and BALDOCK, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

This case is a companion case to *Pittsburg & Midway Coal Mining Co. v. Yazzie*, 909 F.2d 1387 (10th Cir.1990). Although *Pittsburg & Midway* is a civil case and this one a criminal case, both raise the same legal issue, i.e., whether 1.9 million acres in northwest New Mexico remain part of the Navajo Reservation by virtue of two Executive Orders issued in 1907 and 1908. Oral arguments in the two cases were consolidated, and the extensive documentary records were read side by side. We today decide in *Pittsburg & Midway* that the area in New Mexico set aside by Executive Order ("EO") 709, as amended by EO 744, lost reservation status when EOs 1000 and 1284 were issued in 1908 and 1911. Our ruling in that case governs this case as well. Nonetheless, we proceed to write separately to dispose of a second issue arising in this case that was not present in *Pittsburg & Midway*.

Tova Indritz, Federal Public Defender, Albuquerque, N.M., for petitioner-appellant.

## BACKGROUND

Charles Blatchford, a Navajo Indian, was convicted in 1978 in the New Mexico courts of being an accessory to criminal sexual

penetration of a Navajo child and an accessory to the kidnapping of a second Navajo child. He was sentenced concurrently to ten to fifty years on the first count and life imprisonment on the second. After pursuing various appeals in state court, he filed a writ of habeas corpus in federal court, alleging that the state of New Mexico lacked jurisdiction to try him for his offenses. The district court determined that Blatchford's unsuccessful appeal in *Blatchford v. Gonzales*, 100 N.M. 333, 670 P.2d 944 (1983), *cert. denied*, 464 U.S. 1033, 104 S.Ct. 691, 79 L.Ed.2d 158 (1984), and its procedural aftermath had completed the requirement of exhaustion of state remedies.

The criminal acts of which Blatchford was convicted occurred in 1977 within a rural settlement area known as Yah–Ta–Hey, more specifically within section 7 of Township 16 North, Range 18 West, New Mexico Principal Meridian. Section 7 and the surrounding sections fall within an area added in 1907 to the Navajo Reservation by EO 709, as amended by EO 744. Blatchford alleged that the 709/744 area had never lost its reservation status and that, therefore, exclusive federal jurisdiction to try him lay with the federal courts under the Federal Major Crimes Act, 18 U.S.C. § 1153. Alternatively, he alleged that even if the area had lost reservation status, it was a "dependent Indian community," also mandating federal criminal jurisdiction in his case. After an eight-day evidentiary hearing before the U.S. Magistrate, and after proposed findings by the Magistrate, to which both parties objected, U.S. District Judge Howard Bratton ruled that the crimes of which Blatchford had been convicted did not occur within either an Indian reservation or a dependent Indian community and, therefore, 18 U.S.C. § 1153 did not apply. The district court dismissed Blatchford's petition, and he appeals. We affirm.

## I.

The Federal Major Crimes Act provided "Any Indian who commits against the person or property of another Indian or other person any of the following of-

fenses, namely ... kidnapping, rape, ..., within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States."

18 U.S.C. § 1153 (1982). For purposes of the Act, Indian country is defined as

"(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

18 U.S.C. § 1151.

█ Blatchford concedes that the offenses of which he was convicted did not occur on an Indian allotment under 18 U.S.C. § 1151(c). We have already ruled in *Pittsburg & Midway* that the area in which the offenses occurred lack reservation status. Therefore, they do not fall within section 1151(a). That leaves for resolution the issue of whether they occurred within a dependent Indian community under section 1151(b). The issue before us raises a jurisdictional question, and we review de novo the district court's legal conclusion that Yah–Ta–Hey is not a dependent Indian community. The factual characteristics of the Yah–Ta–Hey area are essentially undisputed, and in reviewing them this court is essentially reviewing the legal conclusion drawn from them by the district court. *See United States v. Morgan*, 614 F.2d 166, 170 (8th Cir.1980).

## II.

█ The standards guiding the determination of what constitutes a dependent Indian community have been spelled out in a series of federal cases dating back to 1913. The early cases from which interpretation of the term dependent Indian community

derives are *United States v. Sandoval*, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913) and *United States v. McGowan*, 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938). *Sandoval* concerned the status of about twenty scattered pueblos (communities or villages) owned communally in fee simple by the Pueblo Indians under grants from the King of Spain that were subsequently confirmed by Congress. Like reservation Indians, the Indians of the pueblos were treated by the United States as dependent peoples, *Sandoval*, 231 U.S. at 40–41, 34 S.Ct. at 3–4. The federal government provided agents and superintendents to "guard their interests," established Indian schools in the pueblos, constructed dams and irrigation works, and set aside additional lands for the use and occupancy of the Pueblo Indians where their own lands were insufficient. *Id.* at 40, 34 S.Ct. at 3. In addition, Congress forbade New Mexico from taxing the lands and other property within the pueblos. *Id.* The *Sandoval* Court concluded that the pueblos had been treated by the legislative and executive branches as dependent communities in need of protection and federal guardianship, especially from the evils of liquor. *Id.* at 46–48, 34 S.Ct. at 5–7. The Court thus declared that the pueblos were subject to a federal criminal prohibition on the introduction of liquor into Indian country. The fact that the lands were held communally rather than in individual ownership and that the pueblos were "distinctly Indian communities" were significant to the outcome.

The *McGowan* case also applied the federal law prohibiting the introduction of liquor into Indian country. In *McGowan*, the United States had purchased a tract of land in which to settle needy, nonreservation Indians living in Nevada. The United States held title to the land for the benefit of the Indians. The Court observed that "Indians of the Reno Colony have been established in homes under the supervision and guardianship of the United States." *McGowan*, 302 U.S. at 538, 58 S.Ct. at 287. The Court added that "[t]he fundamental consideration of both Congress and the De-

partment of the Interior in establishing this colony has been the protection of a dependent people." *Id.* The colony was given the "same protection" as that given Indians on reservations. *Id.* Finally, in declaring the Reno Indian Colony to be a dependent Indian community, the Court summarized the facts as follows:

> "The Reno Colony has been validly set apart for the use of the Indians. It is under the superintendence of the Government. The Government retains title to the lands which it permits the Indians to occupy. The Government has authority to enact regulations and protective laws respecting this territory.... [I]t is not reasonably possible to draw any distinction between this Indian 'colony' and 'Indian country.'"

*Id.* at 539, 58 S.Ct. at 288.

The next case to interpret the term dependent Indian community was *United States v. Martine*, 442 F.2d 1022 (10th Cir. 1971). In *Martine*, we concluded that the term applied to the Navajo community of Ramah, New Mexico, which is typically seen as one of three satellite communities of the Navajo Reservation. Martine was indicted for involuntary manslaughter of a passenger in a truck that he allegedly had been driving when it overturned on land within Ramah. The land was "owned by the Navajo Tribe, ... having been purchased with tribal funds from a corporate owner." *Id.* at 1023. We stated in *Martine* that *Sandoval* confirmed the propriety of the trial court's approach to the determination of dependent Indian community status. The trial court had considered (1) the nature of the area in question, (2) the relationship of the inhabitants of the area to Indian Tribes and to the federal government, and (3) the established practice of government agencies toward the area. *Id.* We acknowledged that other factors could be relevant as well. *Id.* at 1024. Without further discussion of the specific facts, we affirmed the trial court's decision that Ramah was a dependent Indian community and that the federal government had jurisdiction over the crime.[1]

---

**1.** The only other ruling issued from a court

within the Tenth Circuit of which we are aware

In each of the above cases, the dependent communities represented clusters of Indians grouped together in their own special communities on land owned by a tribe or held in trust for them and arguably outside an established reservation.

Since *Martine,* a series of cases elaborating on the parameters of dependent Indian community status have emerged from within the Eighth Circuit. In *United States v. Mound,* 477 F.Supp. 156 (D.S.D.1979) the court ruled that the Cheyenne River Housing Project SD5–01 in Eagle Butte, South Dakota was a dependent Indian community, and that the crimes allegedly committed therein were subject to federal jurisdiction. In doing so, the court examined the purpose and composition of the community, its relationship to the Cheyenne River Sioux Tribe and the federal government, and the practice of state government agencies toward the community. *Id.* at 158–59. The housing project was on tribal trust land owned by the United States and leased to the Housing Authority for the purpose of constructing a low-rent housing project. The Housing Authority Board was appointed by the Tribal Council, and the project was funded by the United States Department of Housing and Urban Development ("HUD"). The federal government also provided water, sewer, medical, road, and some educational services for the project. The city/county attorney for the area in which the project was located treated the project as under federal jurisdiction. The exact population of the housing project could not be determined, although it was noted that there were both Indian and non-Indian occupants, consistent with the nondiscrimination requirements imposed by HUD. The court concluded that the "crucial consideration" was whether the community " 'has been set apart for the use, occupancy and protection of dependent Indian peoples.' " *Id.* at 160 (quoting *Youngbear v. Brewer,* 415 F.Supp. 807, 809 (N.D. Iowa 1976), *aff'd,* 549 F.2d 74 (8th Cir.

1977)). "[A]ny single talismanic standard such as percentage of Indian occupants" could not be allowed to defeat the purpose of section 1151(b). *Id.* In *Mound,* the dependent Indian community apparently was a subunit within the larger community of Eagle Butte.

The following year, the Eighth Circuit decided *United States v. Morgan,* 614 F.2d 166 (8th Cir.1980). *Morgan* did not concern the meaning of dependent Indian community, but rather the meaning of "non-Indian communities" under 18 U.S.C. § 1154, a statute prohibiting the introduction of intoxicants into Indian country. The term "Indian country" in section 1154 specifically excluded fee-patented lands in non-Indian communities. 18 U.S.C. § 1154(c). In *Morgan,* two non-Indian bars within the exterior boundaries of the Standing Rock Sioux Indian Reservation were judged to be within non-Indian communities under the statute. In deciding that the Dew Drop Inn and the Cattleman's Saloon were not subject to the statute, *Morgan* relied on the dictionary definition of "community" supplied in *Berry v. Arapahoe and Shoshone Tribes,* 420 F.Supp. 934, 940 (D.Wyo.1976) (" 'unified body of individuals ... with common interests living in a particular area; ... an interacting population of various kinds of individuals in a common location' ") (quoting *Webster's New Collegiate Dictionary* (1975)). *Morgan* concluded that an element of cohesiveness was basic to the definition of community. Cohesiveness could be manifested, it said, by economic pursuits in the area, by common interests, or by the needs of the inhabitants as supplied by the locality. *Morgan,* 614 F.2d at 170. The court then found that the bars, despite their on-reservation location, were part of non-Indian communities for economic purposes. The Dew Drop Inn, whose patrons were mostly non-Indian, was found to be within the tiny non-Indian community of Mahto. *Id.* The Cattleman's Saloon was found to be within the

---

is *United States v. Oceanside Oklahoma, Inc.,* 527 F.Supp. 68 (W.D.Okla.1981). In *Oceanside,* the court held that a tract of land held in fee patent by a non-Indian and surrounded by checkerboarded Indian and non-Indian lands was not part of an Indian community and was not within Indian country; therefore, the statutory prohibition on sales of liquor in Indian country did not apply. *Id.* at 69–70.

"community of interest and influence" of the adjacent, off-reservation, non-Indian community of McLaughlin. *Id.* at 171.

Soon after *Morgan*, the Eighth Circuit ruled in *Weddell v. Meierhenry*, 636 F.2d 211 (1980), that Wagner, South Dakota was not a dependent Indian community even though located within the exterior boundaries of the original Yankton Sioux Reservation. In affirming the correctness of state court jurisdiction over grand larceny and burglary charges against Weddell, the court found dispositive the incorporation of Wagner as a municipality independent of the Tribe, private ownership of 95 percent of the property within the town, and the overwhelmingly non-Indian population of the town (only 16.3% of the population was Indian). *Id.* at 213.

The following year the Eighth Circuit decided the case of *United States v. South Dakota*, 665 F.2d 837 (8th Circuit 1981). The circuit ruled that the housing project located in Sisseton, South Dakota was a dependent Indian community. Paralleling the structure of the *Mound* decision, 477 F.Supp. 156, it evaluated who held title to the land in question and then considered the purpose and composition of the community, its relationship to the federal government and the Sisseton–Wahpeton Sioux Tribe, and the relationship between the federal and state government. It reviewed the undisputed findings that the land was tribal trust land held for the Tribe for use as a low-rent housing project, that the primary beneficiaries of the project were Tribal members, and that extensive services were provided to Indian residents by both the federal government and the Tribe. It ruled that the state's assertion of jurisdiction over the project did not defeat federal jurisdiction. *Id.* at 842–43 (citing *United States v. John*, 437 U.S. 634, 653, 98 S.Ct. 2541, 2551, 57 L.Ed.2d 489 (1978)).[2] Notably, it declined to consider the state's arguments, raised for the first time on appeal, that (1) the proper community of reference should be the entire community of Sisseton because the project relied on the city for all vital services, and (2) establishment of the project as a dependent Indian community would result in a checkerboard jurisdiction, undermining state law enforcement efforts. *Id.* at 841–42.

The most recent case on point comes again from the Eighth Circuit. In *United States v. Azure*, 801 F.2d 336 (8th Cir. 1986), an alleged assault occurred on land immediately adjacent to the Turtle Mountain Indian Reservation. The land was held in trust by the United States for the Reservation. The court ruled that the land could be classified as a *de facto* reservation, "at least for purposes of federal criminal jurisdiction." *Id.* at 339. It also ruled in the alternative that the land could be considered a dependent Indian community because the United States retained title to the sparsely populated rural area, the Tribe leased the land only to Indians, and the Bureau of Indian Affairs was involved in the provision of services in the area. *Id.*[3]

---

**2.** The *John* court observed that past lack of continuity of federal supervision over the Choctaws had not destroyed federal power to deal with them in the present, an observation not precisely analogous to the situation in *South Dakota*.

**3.** Aside from the Eighth and Tenth Circuits, only one other circuit court has ruled on dependent Indian community status under 18 U.S.C. § 1153. In *United States v. Levesque*, 681 F.2d 75 (1st Cir.1982), the court ruled that Peter Dana Point, within the Passamaquoddy Indian Reservation in the state of Maine, was a dependent Indian community. *Levesque* is something of an anomaly because, until litigation in the 1970s, the Passamaquoddy Reservation had always been state regulated. In the aftermath of *Passamaquoddy v. Morton*, 528 F.2d 370 (1st

Cir.1975), the federal government declared the Tribe a "'tribal entity'" and eligible for programs administered by the Bureau of Indian Affairs. *Levesque* at 77 & n. 3 (quoting 44 Fed.Reg. 7235–36 (1979)). Relying on the prior case law in the Eighth and Tenth Circuits, the First Circuit held that Peter Dana Point was a dependent Indian community by virtue of its location within a township belonging to the Tribe and almost entirely occupied by Indians. The court also relied on evidence that the federal government offered extensive support to the Tribe and that the state of Maine was no longer funding the Tribe. *Id.* at 78. After *Levesque* was decided, the state of Maine and the United States apparently agreed that Maine would assume jurisdiction over future crimes within the reservation. *See Id.* at 77 n. 4.

In summary, courts within the Eighth Circuit have found dependent Indian community status in three cases (*Azure, South Dakota,* and *Mound*), found it lacking in a fourth (*Weddell*), and found non-Indian community status in a fifth (*Morgan*).[4] In all three of the cases in which dependent Indian community status was established, the lands in question were tribal trust lands.

### III.

We come now to the facts of the case before us. The crimes of which Blatchford was convicted occurred at Yah–Ta–Hey, McKinley County, New Mexico. The district court described Yah–Ta–Hey as a rural and "readily identifiable residential and trading community" including the commercial establishments at the intersection of U.S. Highway 666 and State Highway 264, a small housing subdivision known as Navajo Estates, and the surrounding area within three to five miles of the intersection. District Court Opinion at 18. The record establishes that Yah–Ta–Hey is located approximately eight miles north of Gallup, New Mexico and two miles south of the southern boundary of the Navajo Reservation. The crime site was at and around Navajo Estates, adjacent to the intersection.

The relevant facts surrounding the land status dispute are essentially uncontested. In analyzing the facts, the district court followed the standards established by *Martine* and *South Dakota* and addressed land title, community composition and purpose, and the relationship of the community to the federal government and the Navajo

nation, as well as to the state and county government. With respect to land title, the court noted that section seven, which included the commercial junction and housing subdivision, was in private ownership although the surrounding area was largely Navajo allotment land. It found the composition of the commercial intersection to be largely non-Indian, the composition of Navajo Estates to be mixed, and the surrounding area to be largely Navajo. It found the primary purpose of the community to be commercial, "where local merchants buy Navajo made goods, then distribute them in other locations." *Id.* at 20. It also noted that Yah–Ta–Hey could be characterized as a suburb of Gallup, New Mexico. Finally, the court found that the relationship of the community to the federal government and the Navajo nation was such that the Navajos must travel outside the community to obtain BIA and tribal services with the exception of some tribal law enforcement services. In contrast, Gallup, McKinley County, and the state of New Mexico all provided a variety of services to Yah–Ta–Hey, including water, roads, landfills, public schools, and law enforcement.[5] Yah–Ta–Hey businesses paid state and county taxes and were subject to state and county health and building codes. They were also subject to regulations affecting pawn shops, liquor sales, unemployment compensation, and worker's compensation. *Id.* at 21.

In reviewing the record it becomes clear that the Yah–Ta–Hey "community" is one born out of opportunities for private commercial gain, not one born out of a public need to provide land for use, occupancy, and protection of a dependent people. In

---

4. A second non-Indian-community case from within the Eighth Circuit applied factors used in the dependent Indian community cases under 18 U.S.C. §§ 1151, 1153. *United States v. Mission Golf Course, Inc.,* 548 F.Supp. 1177 (D.S.D. 1982). It found that a golf course near the City of Mission, South Dakota was part of the City for purposes of determining whether or not it was within a non-Indian community under statutes governing the introduction of liquor in Indian country. *See* 18 U.S.C. §§ 1154, 1161. Both the City and the golf course were located within the Rosebud Sioux Reservation. The court concluded that the non-Indian elements in the City did not predominate, thereby subjecting

the defendant golf course to the above cited liquor statutes. *Id.* at 1183.

5. The record reveals that McKinley County and the Navajo Tribe shared law enforcement responsibility in the area between Gallup and the Reservation. Eighty percent of the Navajo police had state commissions so that they could arrest non-Indians. The state police were in the process of seeking Navajo police commissions so that they could arrest Indians on Indian land. R. Vol. V at 82–83, 124. Police from both units patrolled the checkerboarded area regularly.

other words, the primary purpose of the community is not federal protection of dependent Indians but private commercial activity. Yah–Ta–Hey is in both an Indian and non-Indian commercial stream by virtue of its economic activities (e.g., trading post and cafe, gas stations, 7–11 store, pawn shop) at the intersection of two highways. Its cohesiveness springs not primarily from its rural residential pattern but rather from its commercial roots emanating from the highway junction. Nothing in the record indicates that it would be characterized as a community, were it not for its non-Indian commercial center.

The federal government's relationship with the Yah–Ta–Hey community is not with the community qua community, unlike the housing project communities in *Mound* and *South Dakota*. Instead, it is with the approximately 350 Indians who happen to live in the Yah–Ta–Hey area. The same is true for the Tribe's relationship with the community. Although Navajo inhabitants vote in tribal elections and are a part of the Rock Springs chapter (local governmental unit) of the Tribe, eligibility for a variety of services flows to individual inhabitants of the area by virtue of their identification as part of the Navajo Nation, not by virtue of their settlement within an established Indian community.

There is no indication from the Federal Major Crimes Act, or case law construing it, that Congress intended to include Indian allotments clustered around a non-Indian commercial junction on private land as together constituting a dependent Indian community. The fact that much of the area is held in the form of trust allotments does not establish that the "community" itself was established for the use, occupancy, and protection of a dependent people. The case before us contrasts with those described previously, in which dependent Indian communities were located on tribal lands or tribal trust lands and were created by the Indians themselves or the federal government to provide for their economic and political protection. Here, private interests created the "community" character of Yah–Ta–Hey. As *Martine* noted, "[t]he mere presence of a group of Indians in a

particular area would undoubtedly not suffice [to establish a dependent Indian community]." *Martine*, 442 F.2d at 1024. Just because Indians constituted the bulk of the population and gave the area a distinctly Indian character does not convert the community into a dependent Indian community.

We affirm the district court's ruling that although Yah–Ta–Hey is a community populated largely by Indians, it is nonetheless not within the Navajo Reservation and is not a dependent Indian community for purposes of the Federal Major Crimes Act. The district court's dismissal of Blatchford's habeas corpus petition is, therefore, also affirmed.

AFFIRMED.