**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 15 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

   Plaintiff-Appellant,

v.

RANDALL D. ADAIR,

   Defendant-Appellee.

No. 95-7160

---

Appeal from the United States District Court
for the E. Dist. of Oklahoma
(D.C. No. CR-95-3-S)

---

Linda A. Epperley, Assistant United States Attorney (John Raley, United States Attorney, with her on the briefs), United States Attorney's Office, Muskogee, Oklahoma.

Craig P. Bryant, Assistant Federal Public Defender (Stephen J. Knorr, Federal Public Defender, with him on the brief), Office of the Federal Public Defender, Tulsa, Oklahoma.

---

Before **ANDERSON, GODBOLD,**[*] and **MURPHY,** Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

  [*]Honorable John Cooper Godbold, Circuit Judge for the 11th Circuit Court of Appeals, sitting by designation.

The Appellee, a Cherokee Indian, was indicted in the United States District Court for the Eastern District of Oklahoma on four counts of aggravated sexual abuse in violation of 18 U.S.C. § 2241(a). The offenses were alleged to have occurred in a "Mutual Help Home" ("Help Home") built by the Cherokee Nation Housing Authority ("CNHA"), a Cherokee Nation controlled Oklahoma state agency which superintends the provision of housing units for needy Indians with direction and funding from the federal Department of Housing and Urban Development ("HUD"). The property is listed on the county rolls as exempt from state tax, though the CNHA makes payments to the state in lieu of taxes.

The land upon which the Help Home stands was originally acquired by the Appellee's family as a restricted Indian allotment. In 1987 the family removed the restrictions and conveyed the title to the CNHA in order for the Help Home to be built. The Appellee eventually lost the home to his Cherokee Indian ex-wife, the alleged victim in this case, in a divorce action. The home was thus occupied by the Appellee's ex-wife but owned by the CNHA at the time of the alleged crimes. The homesite is in a rural area known as "Rocky Mountain" in Adair County, Oklahoma.

The United States premised federal jurisdiction on 18 U.S.C. § 1153, asserting that Rocky Mountain is a "dependent Indian community" and thus "Indian country" as defined in 18 U.S.C. § 1151. The district court rejected this

argument, however, holding that the Rocky Mountain area is not a dependent Indian community and that the area fails even to constitute an appropriate community of reference for dependent Indian community analysis. Accordingly, the court dismissed the indictment for lack of jurisdiction.[1]

This court has jurisdiction over the United States' appeal pursuant to 18 U.S.C. § 3731. We affirm the district court's dismissal on the grounds that the Rocky Mountain area is neither an appropriate community of reference nor a dependent Indian community under 18 U.S.C. § 1151(b) and thus not Indian country.

## I. FACTUAL BACKGROUND

Rocky Mountain is a rural area of approximately six to twelve square miles surrounding the Rocky Mountain School. It is unincorporated and has no definite geographical boundaries. Rocky Mountain does not appear on maps of general usage. It lies approximately two to five miles outside the city of Stilwell, the Adair County seat, and overlaps other unincorporated, sparsely populated rural areas.

---

[1]The district court issued an elaborate decision, characterized as an order and outlining the factual background, relevant evidence, historical setting and applicable law. *United States v. Adair*, 913 F.Supp. 1503, 1505-14 (E.D. Okla. 1995). In its Order, the district court then proceeded to make findings and conclusions. *Id.* at 1514-17.

The State of Oklahoma maintains the one school in the area, the Rocky Mountain School, which provides instruction only through the eighth grade. The Cherokee Nation provides the Rocky Mountain School with supplemental funds from the federal Bureau of Indian Affairs ("BIA") based upon its Indian student population. These funds are used to provide services to Indian students beyond those services mandated by state law. For example, a portion of the funds are earmarked for Cherokee language classes. There are three churches in the Rocky Mountain area. One is a traditional Indian church founded prior to the Civil War, which conducts services in the Cherokee language. Many of the Cherokee residents in the area speak Cherokee. Dr. Duane King, Assistant Director of the National Museum of the American Indian, opined that the Rocky Mountain area constituted a conservative, traditional Cherokee community.

The eastern region of Oklahoma, which encompasses the Rocky Mountain area, marks the terminus of the Cherokee Indians' forced migration from the southeastern United States and is the location of the original sixteen million acres given to the Cherokee and the other Civilized Tribes in the form of restricted allotments in exchange for those lands lost in their original territories. The federal government placed restrictions upon these allotted lands in order to protect the Indian allotees against unfair purchases of their property. These restrictions, however, have been removed over time and now protect only a small

fraction of the land. Today, most all of the land in the Rocky Mountain area is held restriction-free by Indian as well as non-Indian individuals, though up to fifteen percent of the land remains restricted. Some of the Indian families in the area still possess the land originally allotted to their ancestors.

Approximately 400 people live in the area now, about half of whom are Indian. The Indian residences are scattered among the non-Indian residences. The Indians living in the Rocky Mountain area do not live in a communal lifestyle. There is no record of any tribal or local government nor of any communal gardens or work projects in the area. The area does, however, have an Indian cemetery and an Indian stomp ground.

With the exception of one small convenience store and some farming activity, there are no established businesses in Rocky Mountain. There is no grocery store, bank, restaurant, or post office. People who live in the area shop and bank in nearby towns such as Stilwell. The nearest hospital or doctor's office is located in Stilwell. Stilwell provides employment and serves as the main economic base for the Rocky Mountain area. Mailing addresses in the area are either Rural Route #1 or Rural Route #4, Stilwell, Oklahoma.

Electricity is provided to the Rocky Mountain area by Ozark Electric, a public utility company located in Stilwell and Fayetteville, Arkansas. Water is provided by individual wells or by Adair County Rural Water District #2, a state

service. Trash in the Rocky Mountain area is disposed of in a sanitary landfill provided by the Cherokee Nation for Adair County generally. Other than one highway which was improved by the BIA, the State of Oklahoma and the County of Adair build and maintain the roads in the area.

People who live in the Rocky Mountain area call the Adair County Sheriff's Office for law enforcement assistance, and that office responds to those calls. However, it refers to the Cherokee Nation Marshall's Service those cases which arise in what it perceives to be Indian country. The investigation of the instant case was thus referred to the Cherokee Marshall because the county officials perceived the location of the alleged crime, the victim's Help Home, to be within Indian country.[2]

There are a number of federal social services administered by the Cherokee Nation for which Cherokee Indians living in the Rocky Mountain area are eligible. These include an Indian Health Service nutrition program for the elderly, a BIA substance abuse program, and Head Start. The Cherokee Nation is involved heavily in the administration of the Help Home program as well. It was responsible for establishing the CNHA; it appoints the CHNA Commissioners; and it coordinates the provision of various federal services to the Help Homes,

---

[2]The argument presented to this court by the Appellant is not that the Help Home property is itself Indian country, but that the Rocky Mountain community, in which the Help Home is situated, is Indian country.

-6-

such as the establishment of water hook-ups and sewer facilities. These various services are available to individuals, however, because they are Cherokee Indians living within the original Cherokee Nation fourteen county area in northeastern Oklahoma, not because they live in the Rocky Mountain area or because of any unique status attributed to the Rocky Mountain area.

## II. ANALYSIS

In *Pittsburgh & Midway Coal Mining Co. v. Watchman*, this court established a two-step process for evaluating an assertion of dependent Indian community status. 52 F.3d 1531, 1542-45 (10th Cir. 1995). The first step requires an analysis of whether the area proposed as a dependent Indian community is appropriate as a community of reference. *Id.* at 1543-45. Step two is the application of a four-factor test to the community of reference in order to determine if that community is indeed a dependent Indian community. *Id.* at 1545-46.

### A. Community of Reference

Step one of the *Watchman* paradigm, consideration of the subject locale as a community of reference, itself has at least two analytic ingredients: (1) "the status of the area in question as a community" and (2) consideration of that locale

or "community of reference within the context of the surrounding area."[3]  *Id.* at 1543-44.  If an area such as Rocky Mountain does not emerge from this threshold evaluation as a community of reference, it necessarily cannot constitute a dependent Indian community.

An appropriate starting point is the geographical definition of the area proposed as a community.  Both the government's disclaimers and description of the Rocky Mountain area are telling.  It concedes that Rocky Mountain is neither "an established municipality [nor] a formally incorporated community and possesses no formal or definite boundaries."  Indeed, Rocky Mountain is neither referenced on maps of general usage nor does it constitute a mailing address.  The government describes Rocky Mountain as "located in Adair County, Oklahoma, just north of state highway 100 and immediately east of the Cherokee County/Adair County line."  The government does not propose any objective indicia, natural or man-made, to describe Rocky Mountain.[4]  It proposes no

---

[3]In order to impart the complete prescription for analysis of the area proposed as the community of reference, *Watchman* assumes establishment of the first ingredient, a community, in its articulation of the second ingredient or organizing principle.  *See Pittsburgh & Midway Coal Mining Co. v. Watchman*, 52 F.3d 1531, 1543-44 (10th Cir. 1995).

[4]The government does provide a delineation of fifteen inclusive sections in Townships 15 and 16 North, Range 24 East, for what it calls "jurisdictional purposes."  The government, however, then immediately disclaims the limitations of its sectional description of Rocky Mountain by stating that the area "may arguably extend slightly further north, south or east of the description employed."

landmarks, geologic formations, roads, waterways or other observable objects by which one could determine if she were inside Rocky Mountain or outside Rocky Mountain.

While an area need not be an established municipality, an incorporated political subdivision, or authoritatively and precisely defined by metes and bounds in order to be an appropriate community of reference in which to test the existence of a dependent Indian community, the absence of any discernable boundaries is significant.[5] *See* Felix S. Cohen, *Handbook of Federal Indian Law* 39 (Rennard Strickland et al. eds., 1982 ed.) (discussing reasonably definable boundaries as an implied element of dependent Indian communities). Without some objective boundaries, consideration of the applicable factors in the dependent Indian community analysis itself becomes problematic. Furthermore, the nature and significance of issues which hinge upon the determination of whether a particular site is within or without Indian country[6] demand some

---

[5]Generally, cases which result in dependent Indian community designation are areas exhibiting reasonably distinct boundaries. *See, e.g., United States v. Sandoval*, 231 U.S. 28 (1913) (Pueblos of New Mexico); *United States v. McGowan*, 302 U.S. 535 (1938) (Reno Colony of Nevada); *United States v. South Dakota*, 665 F.2d 837 (8th Cir. 1981) (Indian housing project in Sisseton, South Dakota).

[6]This court has characterized "Indian country classification [as] the benchmark for approaching the allocation of federal, tribal, and state authority with respect to Indians and Indian lands." *Indian Country, U.S.A., Inc. v. Oklahoma Tax Comm.*, 829 F.2d 967, 973 (10th Cir. 1987).

semblance of boundary objectivity. Finally, the absence of boundary definition, identity on maps, reference as a mailing address, and a specific governing body all suggest that Rocky Mountain lacks defining credentials as a community.

In focusing on infrastructure, *Watchman* defined community as "a mini-society consisting of personal residences and an infrastructure potentially including religious and cultural institutions, schools, emergency services, public utilities, groceries, shops, restaurants, and the other needs, necessities, and wants of modern life." 52 F.3d at 1544. While the Rocky Mountain area contains some of these aspects of community, it is missing most.

Without a doubt, there exists within even the fluid Rocky Mountain parameters suggested by the government, Indian and non-Indian cemetaries; an Indian stomp ground; an elementary school; three churches, one of which is Indian; a convenience store; and some farms. These items alone, however, are not the makings of a community. Rocky Mountain lacks the quality and quantity of activity and institutions which create infrastructure and, in turn, community; features like a hospital, a doctor, a grocery store, a public utility office, a bank, a restaurant.

A consideration of the Rocky Mountain area "within the context of the surrounding area," as required by *Watchman*, confirms that Rocky Mountain defies the meaning of community. *See id.* at 1543-44. The Rocky Mountain area

is not its own source of infrastructure. Nearby towns, the county, and the state provide infrastructure, government, essential services, and employment for the Rocky Mountain area. *See Watchman*, 52 F.3d at 1544 (citing *Blatchford v. Sullivan*, 904 F.2d 542, 548 (10th Cir. 1990), as suggesting inappropriateness of area as community of reference where infrastructure provided by nearby cities, county, and state).

To be sure, fifty percent of the population in Rocky Mountain share a Native American heritage. More specifically, the Cherokee residents share a common history, culture and non-English language. This assumed cohesiveness among a significant segment of those residing in the Rocky Mountain area, however, is not a substitute for and does not overcome the absence of infrastructure and essential services generated from within. While a community cannot be expected to originate all or even most of the "needs, necessities, and wants of modern life," *see Watchman*, 52 F.3d at 1544, Rocky Mountain is remarkable for the dearth of community features. It lacks objective acknowledgment as a community; there is a paucity of institutions and services; and there exists a generalized dependency on surrounding areas. While no one of these characteristics is necessarily determinative, in the aggregate they demonstrate that Rocky Mountain is not a community and thus cannot be a

community of reference for testing the presence of a dependent Indian community.

## B. Dependent Indian Community

Even assuming that the Rocky Mountain area is an appropriate community of reference, it fails to qualify as a dependent Indian community. Such was the holding of the court below, a determination to which we now apply *de novo* review. *See Watchman*, 52 F.3d at 1542.

The *Watchman* decision specified the factors determinative of dependent Indian community status:

> [W]hether a particular geographical area is a dependent Indian community depends on a consideration of several factors. These include: (1) whether the United States has retained "title to the lands which it permits the Indians to occupy" and "authority to enact regulations and protective laws respecting this territory"; (2) "the nature of the area in question, the relationship of the inhabitants in the area to Indian tribes and to the federal government, and the established practice of government agencies toward the area"; (3) whether there is "an element of cohesiveness . . . manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality"; and (4) "whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples."

*Watchman*, 52 F.3d at 1545 (quoting *United States v. South Dakota*, 665 F.2d 837, 839 (8th Cir. 1981) (citations omitted)). Consideration of these factors below indicates that the Rocky Mountain area, even if it were considered an appropriate community of reference, fails to qualify as a dependent Indian community.

**1.    United States' title to and power over the lands**

Title to most of the land in the Rocky Mountain area is owned privately by individuals.  Neither the federal government nor the Cherokee Nation owns any significant portion of the area beneficially or in trust.  No more than fifteen percent of the land remains as restricted Indian allotment land, which does not at all translate into federal government ownership, dominion, or jurisdiction over the Rocky Mountain area generally.  There is no record indicating that the federal government exercises any regulatory or protective legal authority over the Rocky Mountain area.[7]   Thus, the federal government has not retained title to the land in the Rocky Mountain area, nor has it retained regulatory or protective legal authority over the area.

---

[7]The Cherokee Nation Marshall, William Ragsdale, has determined that the Rocky Mountain area is a dependent Indian community and thus subject to the law enforcement jurisdiction of the Cherokee Nation.  This assertion of jurisdiction by Marshall Ragsdale, however, is just that and does not reflect upon the actual power, authority, and jurisdiction of the federal government or the Cherokee Nation.  Marshall Ragsdale's assertion of authority presents the question rather than the answer in this case.

The Appellant also relies upon HUD regulation of Help Homes in the Rocky Mountain area.  This federal regulatory control, however, is limited to the isolated properties upon which Help Homes have been built and does not constitute control or authority over the area as a whole.  The record indicates there are at least two Help Homes in the Rocky Mountain area.

**2. Nature of the area, relationship of the inhabitants to Indian tribes and federal government, and practice of government toward the area**

Rocky Mountain is a sparsely populated, rural area with a roughly equal mix of Indian and non-Indian residents. It is not owned or controlled by the federal government or the Cherokee Nation. Cherokee Indian residents in the Rocky Mountain area are eligible for a variety of social services administered by the Cherokee Nation. Eligibility arises from these residents' individual status as Cherokee Indians, not from the status of the Rocky Mountain area as an established, protected, or serviced community. *See Blatchford*, 904 F.2d at 549 (10th Cir. 1990) (holding that Yah-Ta-Hey area of New Mexico was not dependent Indian community because, among other reasons, federal government's relationship with Yah-Ta-Hey was with individual Indians who lived there rather than with "community qua community"). Non-Indian residents of Rocky Mountain are obviously not eligible for these services.

The Rocky Mountain area is not dependent upon the Cherokee Nation or the federal government. Its school is maintained by the state, and the funds provided to it by the Cherokee Nation are merely supplemental. Although trash generated in the Rocky Mountain area is deposited in a landfill provided by the Cherokee Nation, that landfill appears to be intended for Adair County as a whole. Water is generally supplied by the state. Except for some improvements made upon one highway by the BIA, the state and the county build and maintain

-14-

the roads in Rocky Mountain. Furthermore, although the Adair County Sheriff's Office refers cases which it perceives as having arisen in Indian country to the Cherokee Nation Marshall for investigation, emergency police protection is provided to the Rocky Mountain area by the sheriff. The area is dependent upon nearby towns, the county and the state, rather than upon the Cherokee Nation or the federal government. *See Blatchford*, 904 F.2d at 548 (basing holding that Yah-Ta-Hey was not dependent Indian community in part upon finding that Yah-Ta-Hey was serviced primarily by city, county, and state rather than by federal government or Navajo Nation).

Unquestionably, Cherokees in the area are eligible for a variety of federal or tribal services. This phenomenon, however, reflects upon dependency of those individuals rather than dependency of the Rocky Mountain area. *See id.* at 549. Further, while there are a few instances in which federal or Cherokee Nation funds benefit Rocky Mountain generally, these instances are minimal and are insufficient to suggest that Rocky Mountain is dependent upon the federal government or the Cherokee Nation.

**3.    Cohesiveness of the area**

The analysis of the Rocky Mountain area as a community of reference is pertinent to consideration of its cohesiveness. The want of infrastructure, the

scarcity of economic and institutional activity, the absence of any governing body, and dependence on surrounding communities belie cohesiveness generally in the Rocky Mountain area.

Half of the residents, however, share an Indian culture. There are manifestations of this shared culture in the form of a stomp ground, a cemetery, a church, supplemental education funds, a trash dump, and the improvement of a highway by the BIA. These matters, however, have not been shown to provide a community glue. At best they demonstrate a degree of Indian flavor but fall far short of reflecting an Indian community. *See id.* (holding that the fact that Indians in Yah-Ta-Hey "gave the area a distinctly Indian character [did] not convert the community into a dependent Indian community").

4. **Area lands set apart for the use, occupancy, and protection of dependent Indian peoples**

The Rocky Mountain area has not been set apart for the use, occupancy, and protection of Indian peoples. The Appellant points to the small percentage of land which is still held by Indians today as restricted allotments with the attendant federal protections. The Appellant also points to the Help Homes in the area, including the situs of the alleged crimes in this case, homes which are set apart for the occupancy of needy Indian peoples. Most of the land in the Rocky Mountain area, however, is not encumbered by such restrictions, nor is it set apart

for needy Indian people. It is, rather, owned freely by individuals. Clearly, the Rocky Mountain area as a whole is not set apart for the use, occupancy, and protection of dependent Indian peoples.

### III. CONCLUSION

Dependent Indian community designation is "intended to afford criminal jurisdiction over [offenses] committed by Indians in communities which are both 'Indian' in character and federally dependent." *United States v. Cook*, 922 F.2d 1026, 1031 (2nd Cir. 1991 (citations omitted)). The Rocky Mountain area is not a community; nor is it Indian in character or federally dependent. It is therefore neither a dependent Indian community nor Indian country.

Accordingly, federal jurisdiction cannot be premised on 18 U.S.C. § 1151(b), and the district court's dismissal of the indictment is **AFFIRMED.**