113 F.3d 1246
 97 CJ C.A.R. 875
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Tommy Mongrain EAVES, Petitioner-Appellant,
v.
Ron CHAMPION and Attorney General of Oklahoma,
Respondents-Appellees.
THE CHEROKEE NATION, Amicus Curiae.
 No. 94-5232.
 United States Court of Appeals, Tenth Circuit.
 June 2, 1997.
 
 ORDER AND JUDGMENT*
 Before ANDERSON, GODBOLD,** and MURPHY, Circuit Judges.
 
 
 1
 In 1986 Tommy Mongrain Eaves ("Appellant") was convicted of second degree murder in Oklahoma state court. He appeals the denial of his petition for writ of habeas corpus under 28 U.S.C. § 2254. The Appellant argues, as he did in his state trial and on direct criminal appeal, that the State of Oklahoma lacked jurisdiction over the crime because it occurred in an Indian housing project which, Appellant contends, qualified as a dependent Indian community and, thus, as Indian country under 18 U.S.C. § 1151.
 
 
 2
 Where a state conviction is collaterally attacked in a habeas corpus proceeding under § 2254, the burden of proof is on the petitioner. See Christakos v. Hunter, 161 F.2d 692, 694 (10th Cir.1947); Bouchillon v. Estelle, 628 F.2d 926, 928 (5th Cir.1980) ("It has long been recognized that the burden of proof is on the petitioner in a habeas corpus proceeding."). This court exercises jurisdiction pursuant to 28 U.S.C. § 1291, holds that the petitioner has not met his burden, and affirms.
 
 
 3
 The evidence presented to the United States District Court for the Northern District Court of Oklahoma derived primarily from the concise "Agreed Statement of Fact" to which the parties stipulated in the original state trial. This stipulation reads as follows:
 
 
 4
 The Housing Authority was formulated under [Oklahoma statutory law. See Okla. Stat. tit. 63 § 1057 et seq.] ... [T]he commissioners of the housing authority are appointed by the Osage Tribal Chief with unanimous approval of the Tribal Council and serve at their pleasure....
 
 
 5
 * * *
 
 
 6
 ... Osages are given by resolution of the board first priority and other Indians second priority at all times material....
 
 
 7
 * * *
 
 
 8
 ... [I]t's [sic] source of initial funding and continual funding is the Housing Urban Development [sic], a branch of the Federal Government.
 
 
 9
 The Indian Health Service does the sanitary, water and sewage facilities in the project.
 
 
 10
 The title of the land remains in the authority until paid....
 
 
 11
 * * *
 
 
 12
 ... [A]pproximately 90% of participants are Indian....
 
 
 13
 * * *
 
 
 14
 ... [N]o taxes on the land may be levied or paid to Osage County, Oklahoma, but payment is made in lieu of taxes.
 
 
 15
 The Johnson-O'Malley Act provides funds for the Indian schooling....
 
 
 16
 * * *
 
 
 17
 ... [T]he Defendant and the victim (son and father) are of Indian extraction and on Tribal Roll.
 
 
 18
 Brief in Support of Motion to Dismiss, Oklahoma v. Eaves (CRF-85-65), Record, Vol. II at p. 2-15--2-16. The parties also stipulated that the Housing Authority entered into a "Cooperation Agreement" with the City of Pawhuska ("Pawhuska"), under which Pawhuska was to provide all public services including police and fire protection, water, sanitation, sewer, electricity and road maintenance, while the federal government provided for the purchase of the land, the construction of the homes, and the installation of the utilities.
 
 
 19
 The district court rejected Appellant's claim that the Indian housing project in question constituted a dependent Indian community, and it denied his petition accordingly.[1] We review the district court's denial of the petition for habeas corpus de novo. See Blatchford v. Sullivan, 904 F.2d 542, 544 (10th Cir.1990).[2]
 
 
 20
 In Pittsburgh & Midway Coal Mining Co. v. Watchman, this court specified the substantive factors determinative of dependent Indian community status:
 
 
 21
 "[W]hether a particular geographical area is a dependent Indian community depends on a consideration of several factors. These include: (1) whether the United States has retained 'title to the lands which it permits the Indians to occupy' and 'authority to enact regulations and protective laws respecting this territory,'; (2) 'the nature of the area in question, the relationship of the inhabitants in the area to Indian tribes and to the federal government, and the established practice of government agencies toward the area,'; (3) whether there is 'an element of cohesiveness ... manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality,'; and (4) 'whether such lands have been set apart for the use, occupancy, and protection of dependent Indian peoples.' "
 
 
 22
 52 F.3d 1531, 1545 (10th Cir.1995) (quoting United States v. South Dakota, 665 F.2d 837, 839 (8th Cir.1981) (citations omitted)); see also United States v. Adair, 1997 WL 179380, at * 5 (10th Cir. Apr. 15, 1997). Each of these factors is to be considered in making the appropriate analysis of the overall character of the locale in question; none of these factors is dispositive.[3] See Adair, 1997 WL 179380, at * 4-5 (analyzing each of the Watchman factors without relying on any one factor as dispositive). As this court has stated, any " 'talismanic standard ... could not be allowed to defeat the purpose of section 1151(b).' " Blatchford, 904 F.2d at 546 (quoting United States v. Mound, 477 F.Supp. 156, 160 (D.S.D.1979)). The facts now before this court are analyzed below according to the four Watchman factors.[4]
 
 
 23
 The first Watchman factor considers whether the United States has retained title to and power over the lands. Title to the Indian housing project is held by the Osage Indian Housing Authority ("Housing Authority"). Although the Housing Authority is a state created agency, its commissioners are appointed by and serve at the pleasure of the Osage Tribal Chief and Council. The Housing Authority in turn operates and controls the housing project. The stipulated facts also reveal that the federal government is the source of initial and continuing funding for the Housing Authority. While this funding, along with the regulatory oversight of the Department of Housing and Urban Development, could reasonably be interpreted as suggesting the federal government has retained a degree of authority over the housing project, the Appellant has not developed, explained, or referenced specific facts from the record which concretely demonstrate that the federal government has actually maintained and exerted such power over the particular housing project and its residents. Thus, there are insufficient facts to justify a conclusion that the federal government has maintained authority over the project. To the contrary, there are facts which suggest a contrary conclusion: that the federal government has yielded its authority. For example, the stipulated facts reveal that law enforcement power is exercised by Pawhuska under the Cooperation Agreement.
 
 
 24
 The second Watchman factor focuses on the nature of the area, the relationship of the inhabitants to Indian tribes and the federal government, and the practice of government toward the area. There is little in the record illuminating these matters. It has been established that the Osage Tribe controls the Housing Authority; that 90 % of the project participants are Indian; that the federal government, through the Department of Housing and Urban Development, provided initial funding for purchasing the land, building the houses, and setting up the facilities for utility services; that the Housing Authority receives continued funding from the federal government; that no state taxes are levied or paid on the land, but that payment is made in lieu of taxes; and that federal Johnson-O'Malley Act, see 25 U.S.C. § 452 et seq., funds are provided to the Pawhuska schools to supplement Indian education. It was also established that Pawhuska supplies utilities to the project, as well as police and fire protection under a Cooperation Agreement.
 
 
 25
 These facts create an inconclusive picture, suggesting only that the housing project has a mixture of governmental relationships with the Osage Tribe, the United States, the State of Oklahoma, and the City of Pawhuska. While it may be inferred that the federal government maintained a high level of involvement in funding, control, and administration of various public services for the housing project and its residents, the Appellant has not developed or presented evidence which concretely demonstrates as much. Thus, the evidence which bears upon this second Watchman factor is insufficient to conclude that the housing project is a dependent Indian community.
 
 
 26
 The third Watchman factor focuses on the cohesiveness of the area. There is little evidence before this court which addresses the question of whether the housing project area and its inhabitants exhibit cohesiveness. Undeveloped, isolated facts such as the project's 90% Indian population or the Osage Tribe's structural control over the Housing Authority, though relevant, do not provide sufficient evidence of cohesiveness to tilt the analysis in favor of dependent Indian community designation. Nor do general accounts of the history of Indian peoples in Oklahoma demonstrate the cohesiveness of the actual residents of the particular housing project in question.
 
 
 27
 The fourth Watchman factor considers whether the lands have been set apart for the use, occupancy, and protection of dependent Indian peoples. Certainly, the Housing Authority's purpose is to provide low-income housing for Indians. Osage Indians are given first priority for housing; other Indians are given second priority; approximately 90% of the housing project participants are Indian. In some sense, the project has thus been established and set apart primarily for the use of Indians. There is, however, little if any development in the record of the nature and extent of these Indian participants' dependency upon the federal government. The court is unable, given the status of the facts and evidence, to determine whether the Indians living in the housing project receive regular assistance from the federal government, other than the subsidized housing itself.
 
 
 28
 In conclusion, the factual record before this court fails, under the four-factor Watchman test, to establish that the housing project in question constitutes a dependent Indian community.[5] Accordingly, we AFFIRM the district court's denial of the Appellant's petition for writ of habeas corpus.
 
 
 
 *
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3
 
 
 **
 Honorable John Cooper Godbold, Circuit Judge for the 11th Circuit Court of Appeals, sitting by designation
 
 
 [1]
 In addition, the district court denied the Appellant's motion for an evidentiary hearing on the dependent Indian community issue, relying instead upon the evidence which was presented at the initial state trial. This denial was not appealed. The Appellant's position is that "the operative facts are before this Court in the record on appeal."
 
 
 [2]
 The Appellee argues that a new standard of review established by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), codified at 28 U.S.C. § 2254(d), governs this appeal. Such an argument is foreclosed by Edens v. Hannigan, in which a panel of this court held that the amended version of § 2254 did not apply to an appeal for which a certificate of probable cause was issued prior to the AEDPA's date of enactment. 87 F.3d 1109, 1112 n. 1 (10th Cir.1996). As was the case in Edens, a certificate of probable cause was issued in this case prior to the date of the AEDPA's enactment. Appellant's certificate of probable cause was issued on December 15, 1994, and the AEDPA went into effect on April 24, 1996
 
 
 [3]
 The district court held that the "dispositive issue" of the case was the state-agency status of the Housing Authority. The district court further stated, "It is also dispositive that the State of Oklahoma and the City of Pawhuska have always maintained that the project was under their jurisdiction and that neither the Osage Tribe nor the federal government has ever attempted to exercise jurisdiction over the project." Dist. Ct. Opin. at 8 (emphasis added). In light of the multi-factored balancing test mandated in Watchman and Adair, however, no fact may correctly be considered "dispositive." We note that the district court did not have the benefit of this court's rulings in Watchman and Adair at the time of its ruling. This court affirms the district court based on the full Watchman analysis, not limited as the district court ruling. See Hensel v. Chief Administrative Hearing Officer, 38 F.3d 505, 508 (10th Cir.1994) (holding that this court may base decision " 'on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon' by the court below") (citations omitted); Seibert v. Oklahoma ex rel. University of Okla. Health Sciences Ctr., 867 F.2d 591, 597 (10th Cir.1989) (holding that this court may affirm district court's judgment on a ground not relied upon by the district court if supported by record, provided litigants had fair opportunity to develop record)
 
 
 [4]
 The threshold issue of whether the proposed area constitutes an appropriate community of reference was not addressed by the parties or the district court. See United States v. Adair, 1997 WL 179380, at * 3 (10th Cir.1997). Because this court finds that the facts in the record fail to establish that the Indian housing project in question constitutes a dependent Indian community under the substantive four-factor analysis, it is unnecessary to address this threshold issue
 
 
 [5]
 The instant case is distinguishable from United States v. South Dakota, 665 F.2d 837 (8th Cir.1981), the case from which Watchman drew its fourfactored dependent Indian community analysis. See Watchman, 52 F.3d at 1545. In South Dakota, the United States Court of Appeals for the Eighth Circuit held that an Indian housing project located in Sisseton, South Dakota, was a dependent Indian community. South Dakota, 665 F.2d at 842. The holding of South Dakota rested on a more complete factual picture of federal dependency. For example, the federal government held title to the land in trust for the tribe; the federal government and the tribe maintained a broad range of specific social services for the project; and the tribe had a history of performing certain law enforcement roles within the project. Id. at 839-42. South Dakota did not set forth a per se rule that Indian housing projects constitute dependent Indian communities. Instead, it applied the four-factor test in a careful and thorough examination of the facts of the case to determine that the particular housing project in question constituted a dependent Indian community. The facts before this court regarding the instant case do not warrant the same conclusion